DOROTHY M. GUHLKE v. ROBERTS TRUCK LINES AND OTHERS.

128 N. W. (2d) 324.

May 1, 1964—No. 39,122.

*Lawrence Hazen, Harry Christian,* and *Hansen, Hazen & Lynch,* for relators.

*Dygert & Gunn,* for respondent claimant.

*Berens & Rodenberg* and *William T. O'Connor,* for respondent employer.

SHERAN, JUSTICE.

Certiorari upon the relation of Doughboy Industries, Inc., and its insurer to review a decision of the Industrial Commission.

On May 8, 1959, Vernon H. Guhlke while operating a tractor-trailer unit owned by Robert, Merrill, and Beach Roberts of Sleepy Eye, d. b. a. Roberts Truck Lines, collided with a train near Norwood, Minnesota, and sustained personal injuries which resulted in his death on June 2, 1959. At the time of the accident the trailer was loaded with processed feed manufactured by Doughboy Industries, Inc., of New Richmond, Wisconsin, hereinafter called Doughboy.

Mr. Guhlke had been hired by one of the partners in March 1959 to work on a part-time basis operating equipment owned by the partnership to haul animal and poultry feeds for Doughboy from New Richmond to certain areas in Minnesota and, in some instances, to haul feed ingredients to New Richmond on the return trip. From the inception of his employment to the date of the accident, the wages earned by Guhlke and the usual social security tax were paid by Roberts. The "log book" with respect to his driving hours was kept by the partnership. Roberts owned three truck tractors and three semitrailers; Doughboy had no financial interest in these vehicles. The name "Roberts Truck Lines" was painted on the truck tractors; Doughboy advertising signs were placed on each of the trailers. The partnership, formed in June of 1958, secured a certificate from the Interstate Commerce Commission to operate as an irregular-route common carrier with authorization to haul animal and poultry feeds from New Richmond, Wisconsin, to certain areas in Minnesota and feed ingredients from other areas in Minnesota back to New Richmond. Until March of 1959 the three partners did all of the driving of the units owned by Roberts Truck Lines; at that time, one of the partners having been called to military service, the employment of Vernon Guhlke as a driver became necessary. His first trip was made in the week ending March 14, 1959. After the death of Mr. Guhlke, his widow filed a claim for compensation benefits against both Roberts and Doughboy. Shortly thereafter Roberts Truck Lines filed a first report of injury form with the Industrial Commission admitting liability under the Workmen's

Compensation Act.[1] Doughboy denied liability, contending it was not Guhlke's employer.

After a hearing a referee determined that Roberts was the only employer; that it was not carrying compensation insurance at the time of the accident; and that Doughboy as a prime contractor of an uninsured subcontractor was liable under Minn. St. 176.215, subd. 1, for the compensation awarded. On appeal to the Industrial Commission, it determined that both Roberts and Doughboy were employers of the decedent and jointly liable for the compensation.

In this court Mrs. Guhlke contends that the evidence supports the finding of the Industrial Commission to the effect that Doughboy was an employer of Vernon H. Guhlke. It is conceded that the factors applied in testing the relationship are: (1) The right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge.[2] In determining whether the status is one of employee or independent contractor, the most important factor considered in light of the nature of the work involved is the right of the employer to control the means and manner of performance.[3]

The evidence could support the following additional facts relevant to the claim that Guhlke was in the employ of Doughboy:

The Interstate Commerce Commission permit under which Roberts operated represented a limited authority and, from a practical standpoint, was of value only to a trucker hauling for Doughboy, which at the time of the accident was the sole source of Roberts' business. In obtaining the permit Roberts was represented by an attorney recommended by Doughboy, and Doughboy's traffic manager appeared at the

---

[1] The practical construction given the relationship by the parties was considered significant in Darvell v. Paul A. Laurence Co. 239 Minn. 55, 57 N. W. (2d) 831.

[2] See, Mount v. City of Redwood Falls, 260 Minn. 16, 108 N. W. (2d) 443; Lindbery v. J. A. Danens & Son, Inc. 266 Minn. 420, 123 N. W. (2d) 695.

[3] See, Lindbery v. J. A. Danens & Son, Inc. *supra*; Pettis v. Harken, Inc. 263 Minn. 289, 116 N. W. (2d) 565.

Interstate Commerce Commission hearing and testified on the issue of need. The partners and Guhlke signed bills of lading as "agents" for Doughboy and, on occasion, collected c. o. d. charges; at times Doughboy serviced Roberts' equipment and the drivers were instructed to notify it in event of accident; drivers who performed in other localities the same duties and functions exercised by Guhlke were considered by Doughboy to be its employees; Roberts' equipment was used at the direction of Doughboy to haul a trailer owned by a third person on one prior occasion without Roberts' knowledge, and on some occasions, apparently including the trip which resulted in the accident, Doughboy contacted the driver directly to request delivery service. Doughboy also specified the order of delivery of its products; determined what it desired to be hauled; furnished a two-wheel "dolly" for use on the trucks in loading and unloading certain of its products; required that the first delivery be made by specified time; and complained if there was a lack of proper conduct on the part of persons hauling its products to its customers. It maintained a drivers' office on the premises in New Richmond where persons hauling its products could assemble.

In Elwell v. Fake, 264 Minn. 329, 119 N. W. (2d) 19, the Industrial Commission found that a deceased truck driver was employed jointly by the truck owner and the consignor of the cargo. The truck owner did not appeal and the decision is expressly restricted to a determination that the evidence supported a finding that Schanno Livestock Pullman Company was an employer of Bernard D. Elwell when he was killed while operating a truck tractor owned by George Fake. But, in that case, Fake had leased his truck to Schanno exclusively for a period of one year. The trailer which was being pulled by this truck tractor was owned by Schanno, which was engaged in the business of hauling livestock. Elwell had been selected as a driver by Schanno and not by Fake. His compensation was fixed by Schanno and he wore a Schanno uniform partially paid for by it. Schanno's insignia was on the truck tractor. It secured a group policy of insurance affording coverage to Elwell as its employee. These factors, all strongly indicative of an employer-employee relationship, are missing in the case before us.

In our opinion the essential right to control the activity of Guhlke in the operation of the Roberts' tractor and trailer unit remained with Roberts at all times here involved.[4] The fact that Doughboy assisted Roberts in securing its Interstate Commerce Commission permit—although suggestive of the inference that the permit was obtained for the principal purpose of securing business from Doughboy—does not support the inference that Doughboy thereby acquired the right to direct the activities of Roberts' employees. Once the permit was issued by the commission, the right to operate under it belonged to Roberts and not to Doughboy. The fact that the partners and Guhlke signed bills of lading as "agents" for Doughboy and that the drivers on occasion collected c. o. d. charges suggests only that the operators of Roberts' trucks found it expedient to accommodate the corporation for which they hauled merchandise. The facts that Doughboy occasionally serviced Roberts' equipment and that on one occasion a Roberts' truck tractor was used for Doughboy purposes without specific authorization by the owner; that Doughboy signs appeared on the trailers owned by Roberts; and that persons operating Roberts' equipment were instructed to notify Doughboy in the event of accident are not of sufficient significance, we believe, to buttress the conclusion of joint control as between Doughboy and Roberts, and surely the occasional use of a dolly owned by Doughboy for purposes of loading or unloading would not bespeak the right of control. The fact that Doughboy regarded as its employees drivers who performed the same functions in other localities as were performed by Roberts' drivers in the area where it had a permit to operate would be of considerable significance under some circumstances,

---

[4]Decisions pertaining to the right to control persons engaged in entirely different types of work activity are of limited value in considering this problem. Otten v. University Hospitals, 229 Minn. 488, 40 N. W. (2d) 81, for example, deals with the status of a student nurse in relation to the University of Minnesota where she was enrolled for nurses training and an affiliated hospital where she received practical training. The case is significant only in the sense that it emphasizes the right-to-control factor in determining that the university rather than the hospital was the employer of the student nurse.

but it is not particularly persuasive here where the product merchandised by Doughboy was shipped in part by rail carrier; in part by a truck owned by it and operated by its employees; and in part, as in the case of Roberts, by an irregular route common carrier paid according to its tariff schedule. The fact that Doughboy on some occasions contacted the drivers of Roberts' trucks directly for delivery service is not of compelling significance under the circumstances of this case where three of the four individuals who operated this equipment were partners. The action of Guhlke in accepting directions for delivery from Doughboy could as well signify intention to expedite the business of the concern which paid him wages as recognition of authority on the part of the shipper.[5] This circumstance is, at best, equivocal. Finally, while it is no doubt true that Doughboy, as the principal source of Roberts' trucking business, was in a position to exert considerable influence with respect to the availability of the truck tractor and semitrailers owned by Roberts, the quality of personnel employed by this concern, and the time and order of delivery, we do not feel that this fact is a sufficient basis for a finding of joint employment.

We believe it to be significant that Roberts was operating as a common carrier. 49 USCA, § 303(a)(14), provides:

"The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes * * *."

In Brothers v. State Industrial Acc. Comm. 139 Ore. 658, 12 P. (2d) 302, it was held that a trucker so franchised was an independent contractor notwithstanding the fact that a fruit shipper told the trucker when and where a load would be ready; instructed him as to how to

---

[5]"What seems to be a consent of the employee may sometimes amount to no more than obedience to a master's command to do work for another temporarily." Petschow v. Scheid, 259 Minn. 474, 477, 108 N. W. (2d) 1, 3.

load cherries so that they would not be injured by jarring; designated what cherries first should be hauled and where they should be delivered; instructed the driver on two occasions to haul freight for other parties; and on one occasion to bring him a load of empty boxes on his return trip; requested the truck driver to load his truck to full capacity and not to carry passengers; and informed the trucker that he would not get work if he was not on hand when the freight was ready.

Our conclusion that the facts do not support a finding that Doughboy was an employer of Guhlke is consistent with and to a certain extent supported by prior decisions of this court. In Turner v. Schumacher Motor Express, Inc. 230 Minn. 172, 41 N. W. (2d) 182, for example, a determination of the Industrial Commission that the deceased employee was not an employee of Schumacher, a company engaged in interstate transportation by truck, was affirmed where the record showed that the decedent had been paid wages by the truck owner, Moore Motor Freight Lines, Inc., the regular employer, which also paid the usual social security tax and workmen's compensation insurance premium on account of his employment, and that Moore had leased the vehicle to Schumacher on a one-haul basis only. This conclusion was reached in spite of the fact that the lease provided that "the said vehicle or vehicles shall be solely and exclusively under the direction and control of the lessee." Darvell v. Paul A. Laurence Co. 239 Minn. 55, 57 N. W. (2d) 831, determines as a matter of law that a person who made use of the equipment and the services of an employee of another became his employer and as such responsible for workmen's compensation where the equipment owner had no interest in the business for which it was used; the employee was placed on the payroll of the company whose business was being furthered by his services; the work of the employee was entirely subject to the user's direction and control; and, most significant, the deceased employee voluntarily accepted the new relationship.

It is our conclusion that Guhlke was an employee of Roberts and not of Doughboy at the time of the accident.

■ The decision of the referee was based on Minn. St. 176.215, subd. 1, which provides:

"Where a subcontractor fails to comply with this chapter, the general contractor, or intermediate contractor, or subcontractor is liable for payment of all compensation due an employee of a subsequent subcontractor who is engaged in work upon the subject matter of the contract."[6]

The Industrial Commission, having found Doughboy to be a joint employer, made no determination with respect to the applicability of the quoted section to this case.

In our opinion the statute does not apply. Doughboy was engaged in the manufacture and sale of feeds; the fact that it placed its product in the hands of a common carrier for delivery does not make it a "general contractor, or intermediate contractor, or subcontractor" within the meaning of this section of the Workmen's Compensation Act.[7]

We reach this conclusion because, in our judgment, the plain language of the statute compels it.

We recognize that many other states have adopted "statutory employer" laws broader in scope than ours[8] and that there are decisions

---

[6]This provision was added to the Workmen's Compensation Act in 1929 (L. 1929, c. 252, § 1) and since that time has been considered only twice by this court. Nylund v. Thornberg, 209 Minn. 79, 295 N. W. 411; Moorhead v. Grassle, 254 Minn. 103, 93 N. W. (2d) 678.

[7]In Moorhead v. Grassle, 254 Minn. 103, 107, 93 N. W. (2d) 678, 681, it was said: "A 'contractor' is ordinarily understood to be the person who undertakes to supply labor and materials for specific improvements under a contract with an owner or principal. It is ordinarily understood that a 'subcontractor' is one who is engaged with a contractor to perform under him some part of the original contract."

[8]The statutes of the various states and interpretive decisions are to be found in 2 Schneider, Workmen's Compensation (Perm. ed.) c. 9, entitled "Principal Contractors, Owners and Lessees as Statutory Employers of Their Contractors' and Sub-contractors' Employees." An example of a statute broader in scope than that adopted in Minnesota is to be found in the Workmen's Compensation Law of Colorado, Colo. Rev. Stat. 1953, § 81-9-1, reading in part: "Any *person* * * * conducting any business by * * * contracting out any part or all of the work thereof to any * * * contractor or subcontractor * * * shall * * * be an employer as defined in this chapter * * *." (Italics supplied.) In RCS Lbr. Co. v. Sanchez,

from other jurisdictions holding a vendor arranging for delivery of the vendor's product by another to be the "statutory employer" of an employee engaged in making the delivery.[9]

These decisions can be explained, in part, by reference to the specific language of the statute involved[10] and, in part, by a disposition

---

136 Colo. 351, 316 P. (2d) 1045, a corporation was engaged in the business of producing finished lumber by purchasing standing timber in New Mexico and contracting with local sawmill operators to cut and deliver it to the RCS mill in Antonito, Colorado. A driver chosen by RCS, but the employee of the sawmill operators by the terms of the contracts, who was employed to furnish a truck and haul lumber to the RCS mill was held to be a "statutory employee" of the corporation within the meaning of the Colorado Workmen's Compensation Act even though the truck driver was designated an independent contractor. See, also, 1 Larson, Workmen's Compensation Law, § 49, et seq., relating to "Statutory Employees." See, Jackson, *Statutory Employment under the Workmen's Compensation Acts*, 25 Kansas City L. Rev. 149. See, also, Annotations, 58 A. L. R. 872, 105 A. L. R. 580, 150 A. L. R. 1214, and 151 A. L. R. 1359.

[9]See, 1 Larson, Workmen's Compensation Law, § 49.12, p. 729. As illustrative of the delivery cases, see Brothers v. Dierks Lbr. & Coal Co. 217 Ark. 632, 232 S. W. (2d) 646; Evans v. Tabor City Lbr. Co. 232 N. C. 111, 59 S. E. (2d) 612; Great A. & P. Tea Co. v. Industrial Comm. 205 Wis. 7, 236 N. W. 575; Jordan v. Lindeman & Co. Inc. 23 N. J. Misc. 194, 42 A. (2d) 781; Swift v. Kelso Feed Co. 161 Kan. 383, 168 P. (2d) 512; Caton v. Winslow Bros. & Smith Co. 309 Mass. 150, 34 N. E. (2d) 638; Greenwald v. Wire Rope Corp. of America, 131 Conn. 465, 40 A. (2d) 748; Huffstettler v. Lion Oil Co. (8 Cir.) 208 F. (2d) 549; Maryland Cas. Co. v. Gulf Refining Co. (La. App.) 110 So. (2d) 784; Durnil v. Grant, 187 Kan. 327, 356 P. (2d) 872; White v. Industrial Comm. 140 Colo. 11, 342 P. (2d) 668; Baker v. Iowa-Missouri Walnut Log Co. (Mo. App.) 270 S. W. (2d) 73; Karvonen v. Stankovich, 357 Mich. 96, 97 N. W. (2d) 715; Van Bibber's Case, 343 Mass. 443, 179 N. E. (2d) 253; Rodgers v. Phillips Lbr. Co. 241 Miss. 590, 130 So. (2d) 856.

[10]Of the cases cited the one most similar is Swift v. Kelso Feed Co. *supra*. The Kansas statute, G. S. 1949, § 44-503, provides: "(a) Where any *person* * * * undertakes to execute any work *which is a part of his trade or business* or which he has contracted to perform and contracts with any other person * * * for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal

on the part of the courts to extend workmen's compensation coverage.[11] We find no case which goes so far as to hold that a statutory employer status can be premised on a relationship of vendor and purchaser existing between the person against whom compensation is sought and his customers.[12] If a manufacturer who places his product in the hands of a common carrier for delivery is to be held liable for workmen's compensation for the benefit of the carrier's employees or their dependents, such policy should be fixed by the legislature and not by this court. In view of our conclusion it is unnecessary to decide whether the phrase "compensation due an employee" as used in § 176.215, subd. 1, includes money benefits to be paid on account of death. See, §§ 176.011, subd. 8, and 176.111, subd. 19.

Reversed.

---

shall be liable to pay to any workman employed in the execution of the work any compensation under this act which he would have been liable to pay if that workman had been immediately employed by him * * *." (Italics supplied.) The Workmen's Compensation Law of New York provides (64 McKinney's Consol. Laws of New York Ann., Workmen's Compensation Law, § 56): "A *contractor*, the subject of whose contract is, involves or includes a hazardous employment, who subcontracts all or any part of such contract shall, in any case of injury or death to any employee, arising out of and in the course of such hazardous employment, be liable for and pay compensation to such employee or persons entitled to compensation on the death of such employee * * *." (Italics supplied.)

[11]"Some statutes, instead of covering all employers who let out work under contract, are limited to 'principal' or 'general contractors.' *This leads to some rather desperate attempts to convert an ordinary entrepreneur into a 'contractor' with someone.*" (Italics supplied.) 1 Larson, Workmen's Compensation Law, § 49.12, note 11.

[12]"The apparent legislative purpose of constituting the principal contractor a statutory employer is to prevent evasion of the act; to protect the employees of sub-contractors who are not financially responsible; to induce all employers to carry insurance; or to make the principal contractor a guarantor of the personal injury obligations of the sub-contractor. However, to constitute a principal contractor the statutory employer of the employees of the sub-contractor, there must be some contractual relationship between the two, so that if there is merely a contract of purchase or some other relation besides that of principal and contractor, there will be no liability." 2 Schneider, Workmen's Compensation (Perm. ed.) § 326.